**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Jerry Gross, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-cv-3214 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| Peoples Gas Light and Coke Co. and | ) | |
| WEC Business Services, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This employment discrimination, failure to accommodate, and retaliation suit comes

before the court on defendants' renewed motion for summary judgment. Plaintiff Jerry Gross

("Gross"), who at all relevant times identified as an African American man with a disability over

the age of 40 (*see* Defs.' Resp. to Pl.'s LR 56.1(b)(3) Am. Stmt. of Material Facts ("RSAF")

¶ 10, ECF No. 149), brings claims against his alleged former joint employers, The Peoples Gas

Light and Coke Company ("Peoples Gas"), and WEC Business Services, LLC ("WBS"), under

42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C.

§ 2000e et seq.; the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12101

et seq.; and the Age Discrimination and Employment Act of 1967, as amended ("ADEA"),

29 U.S.C. § 621 et seq. *See* Third Am. Compl. 1–2, 7–14, ECF No. 55. Peoples Gas contends

that no reasonable jury could find that it was Gross's joint employer. Both defendants argue that

Gross has failed to come forward with sufficient evidence to proceed to trial on all claims. For

the following reasons, defendants' motion is granted except for Gross's claims based on his non-

selection for two internal job vacancies.

## I. Summary Judgment Standard and Local Rule 56.1

### A. *Rule 56 Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from the evidence must be drawn in favor of the nonmoving party–but "only if there is a genuine dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quotation omitted); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor" (citations and quotations omitted)). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### B. *Local Rule 56.1 Fact Statements and Memoranda of Law*

This court's Local Rule ("LR") 56.1 specifies the procedure for presenting facts a party contends are undisputed and material. The formal requirements of LR 56.1 aid the just, speedy, and inexpensive resolution of litigation by ensuring that "the facts material to the issues in the case and the evidence supporting such facts are clearly organized and presented for the court's summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). The Seventh Circuit has therefore "routinely upheld the district court's discretion in requiring parties to comply strictly with local rule requirements." *Id.* (quoting *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)).

Local Rule 56.1(a)(2) requires a party moving for summary judgment to submit "a statement of material facts." The nonmoving party may also submit a "statement of additional material facts." LR 56.1(b)(3). These fact statements must "consist of concise numbered paragraphs" and each paragraph must be "supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." LR 56.1(d)(1)–(2). The opposing party may file a response to these fact statements. *See* LR 56.1(b)(2), (c)(2). "Each paragraph [of the response] shall set forth the text of the asserted fact (including its citations to the supporting evidentiary material), and then shall set forth the response." LR 56.1(e)(1).

> (2) Content. Each [paragraph of the] response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact. If the response admits in part and disputes in part the asserted fact, it must specify which part of the asserted fact is admitted and which part is disputed. A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made. A response may not assert legal arguments except to make an objection, including objections based on admissibility, materiality, or absence of evidentiary support. . . .
>
> (3) Citations. To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited

material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.

LR 56.1(e)(2)–(3).

This court struck the parties' first round of summary judgment briefing and fact statements because both sides violated LR 56.1, and, given the state of the record, the court determined "that strict enforcement of LR 56.1 is required to ensure an accurate and clear presentation of the facts at summary judgment." Order at 5, ECF No. 134 (Jan. 21, 2022). The "most confounding" of the parties' violations was Gross's summary judgment response memorandum, which contained at least 131 direct citations to summary judgment exhibits and no citations to the LR 56.1 fact statements. *Id.* at 3. As this court explained, including direct citations to summary judgment evidence makes identifying what facts are disputed and what evidence supports the parties' factual positions exceedingly difficult. *See id.* at 3–4 (quoting *Magee v. McDonald's Corp.*, 2019 WL 10447014, at *4 (N.D. Ill. Mar. 28, 2019)). The court also found the citations in defendants' LR 56.1(a)(2) fact statement lacked the specificity required by the rule, leaving the court to search through the entire index of exhibits to locate each document cited. *See id.* at 4–5 (citing *Magee*, 2019 WL 10447014, at *4). In ordering rebriefing, this court stated:

> The court does not lightly take the step of ordering rebriefing. A great deal of time and effort likely went into preparing and submitting the parties' summary judgment memoranda and LR 56.1 fact statements and responses. Rebriefing summary judgment will both delay this four-year-old case and impose costs upon the parties and their counsel. Nevertheless, after attempting to sift through the exhibits, legal memoranda, and fact statements, the court concludes that strict enforcement of LR 56.1 is required to ensure an accurate and clear presentation of the facts at summary judgment.

*Id.* at 5.

The present round of summary judgment memoranda and fact statements have remedied some of the issues the court identified. But, overall, the amended memoranda and LR 56.1 fact

statements continue to make determining what facts are disputed and, in some instances, what arguments the parties are making exceedingly difficult.

First, Gross added occasional citations to the LR 56.1 fact statements to his amended memorandum of law opposing summary judgment, but he continues to cite directly to summary judgment evidence throughout, in violation of LR 56.1. *See, e.g.*, Pl.'s Resp. in Opp. to Defs.' Mem. Supp. Mot. Summ. J. ("Resp.") 7–25, ECF No. 144. For example, Gross supports his factual position on joint employment entirely with direct citations to his deposition testimony. *See id.* at 6–7. For the reasons given when the first round of summary judgment briefing was stricken, the court disregards all of Gross's direct citations to summary judgment evidence in his amended response memorandum. *See, e.g.*, *Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 664–66 (N.D. Ill. 2015) (collecting cases).

Next, both sides contend that the evidence their opponent cites does not support, in part or in full, certain paragraphs of the LR 56.1 fact statements. *See, e.g.*, Pl.'s Resp. to Defs.' LR 56.1(a)(2) Am. Stmt. of Material Facts ("RSOF") ¶¶ 8, 12, 25, 36, 38, ECF No. 143; RSAF ¶¶ 9, 16, 25. As it is required to do, the court independently determines whether and to what extent each paragraph of the LR 56.1 fact statements is supported by the cited evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). Indeed, the evidence cited in support of certain undisputed paragraphs of the parties' fact statements does not stand for the proposition for which it is cited. *See, e.g.*, RSOF ¶¶ 46, 52. To the extent the facts not supported by the cited evidence are material, they will be discussed below.

Third, both sides rely on Gross's complaint to support some paragraphs of their fact statement. At summary judgment, the nonmoving party, here Gross, must "go beyond the pleadings . . . [and] designate specific facts showing that there is a genuine issue for trial."

*Celotex*, 477 U.S. at 324 (quotation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A). Since an unverified complaint is a pleading, Fed. R. Civ. P. 7(a)(1), "Citations to the complaint do little, if anything, to show the absence of any genuine issue of material fact." *Baldonado v. Wyeth*, 2012 WL 729228, at *2 (N.D. Ill. Mar. 6, 2012) (citing *Cracco*, 559 F.3d at 632 (other citations omitted)); *see also LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997); *Hintz v. Prudential Ins. Co. of Am.*, 687 F. Supp. 2d 772, 774 n.2 (N.D. Ill. 2009); *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). The court therefore disregards the citations to the third amended complaint in the parties' fact statements and responses insofar as the parties rely on them to show that a material fact is, or is not, genuinely disputed. In some instances, the parties cite other evidence to support a factual position, so the citation to the complaint is not fatal. *See, e.g.*, Defs.' LR 56.1(a)(2) Am. Stmt. of Material Facts ("SOF") ¶ 23, ECF No. 142; Pl.'s LR 56.1(b)(3) Am. Stmt. of Material Facts ("SAF") ¶ 7, 9, ECF No. 143. The court therefore disregards paragraph 42 of defendants' fact statement, ECF No. 142, and paragraphs 2 and 4 of Gross's statement of additional facts,[1] ECF No. 143, because they rely solely on a citation to a portion of the third amended complaint (denied by defendants in their answer, *see* Defs.' Ans. to Pl.'s Third Am. Compl. ¶¶ 5, 11, 54, ECF No. 57).

Finally, defendants assert that paragraphs 4 and 6 of Gross's LR 56.1(b)(3) statement of additional facts are disputed, but defendants cite no evidence in their response to either paragraph. *See* RSAF ¶¶ 4, 6. Gross similarly disputes paragraphs 4–7 of defendants' LR 56.1(a)(2) statement of material facts, but he cites no evidence in response to those

---

1  Gross relies solely on his third amended complaint to establish his race, age, and disability status in paragraph 10 of his statement of additional facts. Defendants admit that Gross identified as a black man over age 40. ECF No. 57 ¶ 7. Gross's age and race are therefore undisputed. The court addresses the dispute over whether Gross was a qualified individual with a disability in Part IV.C, *infra*.

paragraphs.[2]  RSOF ¶¶ 4–7.  The parties' failure to cite evidence in response to a properly supported paragraph of a LR 56.1 fact statement results in the paragraph being deemed undisputed.  *See Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710 (7th Cir. 2015) (citing *Ammons v. Aramark Uniform Servs., Inc*., 368 F.3d 809, 817 (7th Cir. 2004)).  However, since Gross cites only his complaint to support paragraph 4 of the SAF, and the defendants denied the cited paragraph in their answer, the court disregards it.

## II.  Facts at Summary Judgment

Consistent with the above rulings and the summary judgment standard, the court recites the facts supported by the admissible summary judgment evidence in the light most favorable to Gross.  *Torres v. Madrid*, 141 S. Ct. 989, 994 (2021).

### A.  The Parties

"Gross has a master's degree in public administration and over 20 years of experience in Human Resources [("HR")], consulting, labor negotiations, and leadership positions."  RSAF ¶ 1 (citing Gross Resume, Pl.'s Tab A, ECF No. 143-2)[3].  Gross has had high-level HR responsibilities.  For instance, according to his resume, AT&T recruited Gross in 1993 to establish HR services for a new spinoff company.  Gross Resume at 2.

---

2    The facts asserted in paragraphs 4–7 concern joint employer liability.  Gross responds that his memorandum of law will contain argument concerning the inferences to be drawn from the undisputed facts in these paragraphs.  *See* RSOF ¶¶ 4–7.  Gross's memorandum of law contains no such argument, however.  *See* Resp. at 6–7.  The court sustains Gross's objection to paragraph 8 of defendants' LR 56.1(a)(2) fact statement.  Viewed favorably to Gross, the affidavit cited to support paragraph 8 states that WBS and Peoples Gas are separate companies with separate officers and employees, but it does not state that Peoples Gas maintains independent corporate bylaws, minutes, or financial records.  *See* Affidavit of William J. Guc ("Guc Aff.") ¶ 6, Defs.' Tab 1, ECF No. 142-1. The court does not find this factual dispute (or, more accurately, this gap in proof) to be material, however, because Gross does not rely on it as a basis for imposing joint employer liability.  *See* Resp. at 6–7.

3    Plaintiff's Tabs A–O have been docketed electronically as ECF Nos. 143-2 through 143-16, respectively.  Defendants filed their Tabs 1–7 as a single electronic document, ECF No. 142-1.

The two defendants–WBS and Peoples Gas–are corporate cousins.  In 2015, non-party holding company, WEC Energy Group, Inc. ("WEC"), acquired Peoples Gas and WBS's predecessor company, Integrys Business Services ("IBS").  *See* RSOF ¶¶ 1–5.  Peoples Gas and WBS have separate employees and corporate officers.  RSOF ¶¶ 4, 5; *but see id.* ¶ 8 (additional assertions regarding Peoples Gas's corporate activities not supported by the cited summary judgment evidence); Guc Aff. ¶¶ 6–7.  In their briefing, the parties use the term WBS to refer interchangeably to IBS and WBS.  The court does as well.

Under an affiliate agreement, WBS provides administrative services to other companies affiliated with WEC, including Peoples Gas.  RSOF ¶ 6.  These services include accounting, safety consulting, and claims administration.  *Id.*  As occurred with Gross, WBS employees may be temporarily or permanently assigned to a Peoples Gas (or another regulated entity's) facility.  *See* RSOF ¶¶ 6, 28–29.  The affiliate agreement provides that the employee remains a WBS employee at all times during such an assignment.[4]  *See* RSOF ¶ 7.

**B.  Corporate Policies and Forms**

On July 17, 2015, Gross digitally signed a statement attesting that he completed a course on corporate policies (the record does not disclose the course's contents).  *See* RSOF ¶ 10; Affidavit of Amber Tucker ("Tucker Aff.") ¶ 19, Defs.' Tab 2, ECF No. 142-1; Tucker Aff. Ex. 8 at 1.  Defendants identify a form and several written policies applicable to WBS employees: (a) Anti-Harassment and Sexual Harassment Policy; (b) Safety and Health Policy; (c) Employee Selection Policy and Equal Employment Opportunity ("EEO") Policy; (d) Family and Medical

---

4    The parties have not directed the court to a copy of the affiliate agreement.  Defendants rely on an affidavit summarizing it.  *See* Defs.' LR 56.1(a)(2) Am. Stmt. of Material Facts ("SOF") ¶ 7, ECF No. 142 (citing Guc Aff. ¶ 10).  The court implies no findings on the legal effect of the affiliate agreement.

Leave Act ("FMLA") Policy; (e) Time Away From Work Policy; (f) a Non-Occupational Illness or Injury Return to Work ("RTW") Form; and (g) Job Accommodations under the Americans with Disability Act Policy. *See* RSOF ¶¶ 9, 11–20; Tucker Aff. Exs. 1–7. Some of the policies in the record predate WEC's acquisition in 2015 and refer to one or more predecessor companies, and the policies state that they were last revised or reviewed on various dates between October 2014 and August 2015. *See, e.g.*, Tucker Aff. Ex. 4 at 1 (FMLA policy with logo of predecessor company, Integrys). With one exception discussed in the next paragraph, a policy which is incomplete in the record, no question has been raised concerning whether the policies in the record were in effect at all relevant times.[5] *See* RSOF ¶¶ 9–20. Gross contends that a reasonable jury could conclude that defendants did not consistently follow these written policies. *See id.* ¶ 9.

As Gross points out, a portion of the Employee Selection policy in the record has been omitted due to what appears to be a scanning or copying error. *See* Tucker Aff. Ex. 3 at 1–3; RSOF ¶ 12. Since the omitted portion sets out in part the employees to whom the policy applies, the court does not rely on the Employee Selection policy, as it cannot be determined whether this policy applied to Gross. *See* Tucker Aff. Ex. 3 at 1–2. Additionally, the Employee Selection policy incorporates a separate EEO policy that is not in this record. *See* Tucker Aff. Ex. 3 at 3. Gross has not raised any concerns about the absence of the EEO policy from the record, but he disputes that the "EEO policies were followed." *See* RSOF ¶ 13.

Defendants highlight several provisions of these policies. The safety policy states broadly that "employee safety is a prime consideration . . . and shall not be compromised."

---

5  Although this issue is not raised by Gross, pages 2 and 4 of the Time Away From Work policy have been omitted from the record, *see* Tucker Aff. Ex. 5, and the court cannot independently confirm that the policy provides for employees to be paid during a medical leave.

RSOF ¶ 11.  The FMLA policy permits statutorily eligible employees to take up to 12 weeks of job-protected leave.  RSOF ¶ 14.  The ADA policy sets out a procedure for requesting a reasonable job accommodation: completing, signing, and submitting a job accommodation request form.  *See* RSOF ¶ 20; Tucker Aff. Ex. 7 at 1.

With company approval, employees may also take short- and long-term medical leave; employees continue to receive a portion of their salary while on medical leave.  RSOF ¶ 15 (undisputed but not supported in its entirety by cited materials, *see* Tucker Aff. ¶ 16; *id.* Ex. 5).  WBS reserves the right to request a medical certification regarding these absences.  RSOF ¶ 17.  And employees on approved medical leave must keep their managers updated on their status and projected return to work date.  RSOF ¶ 16.

When returning from medical leave, the employee must submit an RTW form completed by a doctor.  RSOF ¶ 18; Blank RTW Form, Tucker Aff. Ex. 6.  Gross submitted several RTW forms.  *See, e.g.*, RSAF ¶¶ 30, 34, 36, 38.  A copy of the blank RTW form follows:

Tucker Aff. Ex. 6; *see also* RSOF ¶¶ 18–19.

### C. Gross's Position, Duties, and Performance Reviews

Gross was hired as a corporate safety consultant in 2012, and he continued in that role

until his termination in 2017. *See* RSOF ¶¶ 21–22; RSAF ¶¶ 2, 39. Gross reported to Charles

Wagner ("Wagner") throughout his employment. *See* RSOF ¶¶ 23, 25 (immaterial, but genuine,

dispute in paragraph 25 concerning Wagner's purported change in title); RSAF ¶ 26. WBS

assigned Gross to work at a Peoples Gas location in Chicago known as "Central Shop." RSOF

¶ 29.

According to WBS's written job description, a safety consultant "administers safety initiatives across WBS, through the delivery of standardized, results driven safety and industrial hygiene programs and processes that safeguard the well-being of employees in the work environment and ensure regulatory compliance." RSOF ¶ 26 (citing Defs.' Tab 4 Ex. 3 at 1, ECF No. 142-1 (job description)). Per the description, physical requirements of the job include sitting, reaching, lifting, standing, walking, pushing, and climbing stairs. *Id.* Also listed is a requirement that the safety consultant operate a truck or crane 34–66% of the time on the job. *Id.*

Gross's day-to-day duties are genuinely disputed. *See* RSOF ¶ 29. Resolving these disputes for Gross, his position involved more hands-on work in the field than planning or strategic work. RSOF ¶ 27 (citing Gross Dep. 25–26, Defs.' Tab 4, ECF No. 142-1). When conducting training in the field, Gross regularly climbed ladders and engaged in digging. *Id.* (citing Gross Dep. 84).

From 2012–15, Gross received ratings of "fully successful" on annual and mid-year performance reviews completed by Wagner. RSOF ¶ 43; RSAF ¶ 3. In August 2015, Gross complained to William Lasko ("Lasko"), WBS's Vice President and Chief HR officer at the time, about a lack of advancement opportunities for minority employees; Lasko told Gross that he would look into the matter.[6] *See* RSOF ¶ 41. The next month (September 2015), Gross filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) (a copy of the charge is not cited in the LR 56.1 fact statements or responses). *See* RSAF ¶ 22; RSOF ¶ 42 (undisputed but not supported by citation to proper summary judgment

---

6   The summary judgment evidence shows that Gross made this complaint on or around August 10, 2015. *See* RSOF ¶ 41. In his response memorandum, Gross lists the complaint date as in or around September 2015. Resp. 22. The date supported by the summary judgment evidence has been used.

evidence). Gross received an "achieves expectation" rating on his next performance review at the end of 2015. RSAF ¶ 22 (undisputed fact).

### D. Disparate Treatment/Hostile Work Environment

Gross compares Wagner's treatment of him to two Caucasian employees who also reported to Wagner: Danielle Clopton ("Clopton") and William Dorst ("Dorst").[7] RSAF ¶ 5. According to Gross's testimony, Wagner asked him to make coffee, set up training rooms, and perform other menial and undesirable tasks. RSAF ¶ 9 (partially disputed). Wagner did not ask Clopton or Dorst to perform similar tasks. *See id.* Gross points to three specific incidents of alleged disparate treatment.

First, on one occasion in 2015, Wagner assigned Gross to lead a training class. *See* RSAF ¶ 6; Gross Dep. 122. Gross responded that Clopton was fully capable of conducting the class, and, according to Gross's testimony, Wagner asked him whether he was being insubordinate and directed him to conduct the class. *See* Gross Dep. 122 ("[Wagner] said you're doing it, and I did it.").

Second, on or around August 7, 2015, Clopton missed a "Confined Space Training" meeting Gross scheduled. *See* RSAF ¶ 7; Pl.'s Tab D Ex. 1 at 1, ECF No. 143-5 (emails dated July 20, 2015, and Aug. 10, 2015). Gross had to do extra work as a result. *See* RSAF ¶ 7; Pl.'s Tab D Ex. 1 at 1. According to an email message from Clopton, she missed the meeting because

---

7    The interrogatory answer Gross cites in paragraph 5 of his statement of additional facts identifies Clopton and Dorst as comparators but does not state their race, age, or disability status. *See* Pl.'s Tab. C Ex. 1 ¶ 8, ECF No. 143-4. In the interrogatory he cites, Gross asked for the "name, age, race, disabled or non-disabled [status], and position title" of every employee who reported to Wagner between January 2012 and January 2018. *See id.* Defendants objected to this question in part and identified Clopton and Dorst as reporting to Wagner, but defendants did not disclose their races, ages, or disability status, arguing that the question was "vague." *See id.* As far as the record shows, Gross did not follow up or file a motion to compel defendants to answer fully this interrogatory.

she had "personal items come up" that made her unable to drive her car. *Id*. at 1 (email dated Aug. 10, 2015).

Finally, following a meeting in October 2015, Wagner assigned Gross to prepare lesson plans and materials needed to lead a one-hour discussion based on ideas that were discussed at a recent meeting. *See* RSAF ¶ 8; Pl.'s Tab D Ex. 2 at 1–2. Gross responded that he believed the assignment could not be completed in the allotted timeline and that it needed to be a group project. Pl.'s Tab D Ex. 2 at 1. Wagner disagreed and instructed Gross to work on the assignment. *See id*.

### E. Internal Job Applications - Failure to Promote

Gross applied for six internal vacancies during his employment, all of which paid more than his safety consultant job and were in a different department. *See* RSOF ¶¶ 44–45, 51–52; RSAF ¶¶ 14, 17 (exact dates of applications unclear from the record); RSOF ¶ 44. Gross applied for the following positions between April 2013 and April 2015: Business Developer, Director of Corporate Security,[8] HR Business/Labor Consultant, Employee Relations Consultant, and Manager of Workforce Planning. RSOF ¶ 44. In January 2017, Gross applied for the sixth position: Manager of Safety. *Id*. ¶ 51.

Gross received interviews for three of the positions but was not offered any of the jobs for which he applied. RSOF ¶ 46, 51–52; RSAF ¶ 18. A non-African American person was selected to fill three of these vacancies and an African American woman was hired for the

---

8    In his statement of additional facts, Gross lists "Director of Corporate Safety" instead of "Director of Corporate Security" as one of the jobs for which he applied. *See* RSAF ¶ 14; Pl.'s Tab C Ex. 3 ¶ 5. Defendants identify this position as "Director-Corporate Security," *see* RSOF ¶ 44, and Gross included the job description for "Director-Corporate Security" as an exhibit to his statement of additional facts, *see* Pl.'s Tab C Ex. 4 at WBS885–86 (exhibit described as containing the "Job Profiles of Six Positions [for which] Gross Applied").

"Manager of Safety" position. *See* RSAF ¶ 19. No evidence of who was selected for the other two positions has been provided. *See id.* Defendants contend that Gross was not selected because he was not the most qualified candidate, but the affidavit they cite says only that Gross was not selected without giving a reason. *See* Aff. of Geeta S. Nagarajan ("Nagarajan Aff.") ¶ 12, Defs.' Tab 5, ECF No. 142-1.

In support of his failure to promote claims, Gross also points to a 2015 internal WEC PowerPoint presentation entitled "Human Resources & Organizational Effectiveness – Update Meeting Mid October 2015." RSAF ¶ 20; Pl.'s Tab E at 1, ECF No. 143-6. The presentation summarizes the results of employee interviews. *See* Pl.'s Tab E at 6–21. The presentation states that the employee interview process had "perceived gaps" and that several ethics complaints had been filed. *Id.* at 12; RSAF ¶ 20.

### F. Disability Discrimination and Gross's Termination

Defendants approved Gross for a disability-related, long-term medical leave not directly related to his claims here beginning in December 2013. *See* RSOF ¶ 30. Gross testified that he underwent several surgeries during this period, including heart surgery. *See* Gross Dep. 45–51 (portion of deposition not cited by the parties).

Gross returned to work on December 29, 2014. RSOF ¶ 31. Earlier that month, on or around December 15, 2014, Gross was diagnosed with pseudogout and osteoarthritis in his right ankle. RSAF ¶ 23. It is undisputed that these conditions, which are incurable, "limit Gross's walking and standing because [they cause] pain, swelling, and inflammation [of] the joints." RSAF ¶ 25. A reasonable jury could also find that, due to pain, these conditions limited Gross's ability to climb stairs, climb ladders, wear heavy boots or safety shoes, and stand or walk for extended periods of time. *See* RSOF ¶¶ 35, 38, 50 (walking restrictions); Letter from

Dr. Anjali R. Gopal at 1, Oct. 14, 2015, Pl.'s Tab. F, ECF No. 143-7, *cited in* RSAF ¶ 25 (other limitations).

Gross reported his diagnoses to Wagner and an HR representative by submitting a note from his doctor on or around December 16, 2014. *See* RSAF ¶ 28. Between January and December 2015, Gross submitted several RTW forms to his employer as his doctors followed up and reevaluated him. *See* RSAF ¶ 30; RSOF ¶¶ 33, 35, 37, 38 (reflecting immaterial disputes over the precise dates on which the RTW forms were submitted). The restrictions on Gross's activities reflected on the RTW forms changed over time. *See ibid.* All RTW forms except the first stated that Gross should not do any squatting or climbing and restricted his standing/walking time to four or fewer hours. *See* RSOF ¶¶ 34–35, 37–38; Tucker Aff. Ex. 10–13 (copies of RTW forms).

It is undisputed that, as an accommodation, defendants allowed Gross to wear specially fitting safety shoes, though it is unclear if or how the shoes helped Gross. *See* RSOF ¶ 39; Tucker Aff. ¶ 31. Defendants also moved Gross's office to the first floor so that he would not have to climb stairs to reach his office. *See* RSOF ¶ 39. And Wagner and another HR employee "told [Gross] that he no longer had to walk up any stair sets." RSOF ¶ 39 (undisputed fact).

At his deposition, Gross testified that "no one explicitly asked" him to climb ladders or stairs or do anything else not permitted by his restrictions. Gross Dep. 84; RSOF ¶ 40. He nevertheless continued to be assigned to conduct field training outdoors, which required him to use ladders and work in the cold for an extended period of time. RSAF ¶ 32 (undisputed). Gross injured his ankle while conducting field training at Crawford Station on November 19, 2015. RSAF ¶ 33. The incident report dated November 20, 2015, states that Gross conducted training, including field training outdoors, on November 19, 2015, and complained that a "preexisting

ankle condition was causing swelling in his right ankle," requiring him to rest and be off his feet. Pl.'s Tab K at 2–3, ECF No. 143-12. According to the report, seen favorably to Gross, prolonged exposure to wind and cold temperatures and uneven, slippery surfaces caused this injury. *See id*. at 3.

Gross submitted RTW forms in December 2015 and January 2016 in which his doctor stated that he was totally incapacitated. *See* RSAF ¶ 34; RSOF ¶ 48. Wagner approved Gross for a medical leave and leave of absence lasting until August 1, 2016. *See* RSOF ¶¶ 47, 49. Gross continued to receive treatment for his ankle during this leave of absence. *See, e.g*., RSAF ¶ 35. Gross submitted additional RTW forms with certain restrictions between June and December 2016. *See* RSAF ¶ 36; RSOF ¶¶ 49–50.

Defendants approved Gross for a further leave of absence beginning in February 2017. RSOF ¶ 53. At some point around this time, Gross submitted a claim to WBS's long-term disability insurance provider. *See* RSAF ¶¶ 39–40; Termination Letter at 1, Oct. 27, 2017, Pl.'s Tab H, ECF No. 143-9.

Defendants terminated Gross in October 2017. RSAF ¶ 40. His termination letter states:

Based upon our conversation on October 20, 2017, you stated that you are not cleared to return to work and you do not have any indication of when you can return to work. Your position regarding your ability to work is inconsistent with the review conducted by Prudential, our third party administrator, which indicated that you are not disabled from performing your job. Prudential has denied your claims and appeals finding that you are not disabled from performing your current position.

Our records show that you were not eligible for FMLA because you have not worked the requisite 1250 hours in the previous 12 months.

Further, as an ADA accommodation, the Company previously approved a multi-month leave which first began in February, 2017 which has expanded more than 36 weeks. Additionally, you have submitted your physician's most recent evaluation, dated October 18, 2017 that provides that you are "totally incapacitated at this time".

**Based upon the information provided by your physician indicating you are not able to work, the Company has decided that your employment will be terminated effective October 27, 2017.**

Termination Letter at 1 (emphasis in original).

Gross subsequently appealed the denial of his long-term disability insurance claim. *See* RSAF ¶ 40. On May 31, 2018, the insurer approved Gross for long-term disability benefits retroactive to August 13, 2017. *Id.* Defendants did not rehire Gross. *Id.*

### III. Joint Employment

Gross seeks to hold WBS and Peoples Gas liable as joint employers. *See* Third Am. Compl. ¶¶ 4, 31–35, 53; Resp. 6–7. The parties agree that at all relevant times WBS, or its predecessor, directly employed Gross and that WBS provided services to Peoples Gas, and other WEC affiliates, under an affiliate agreement. *See* RSOF ¶¶ 4–7 (deemed undisputed because no evidence cited in response); Defs.' Mem. Supp. Mot. Summ. J. ("Mem. Supp. Mot. Summ. J.") 10, ECF No. 137. Peoples Gas argues that Gross has not identified enough competent summary judgment evidence to hold it liable under a joint employment theory. Mem. Supp. Mot. Summ. J. 10–12. The court agrees.

#### A. *Joint Employment Standard*

An employee can have more than one employer under Title VII and the other civil rights statutes under which Gross sues. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 790 (7th Cir. 2019) (42 U.S.C. § 1981); *Frey v. Coleman*, 903 F.3d 671, 676 (7th Cir. 2018) (citing *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015)) (Title VII); *Harris v. Allen Cnty. Bd. of Comm'rs*, 890 F.3d 680, 683–84 (7th Cir. 2018) (ADA); *Hayden v. La-Z-Boy Chair Co.*, 9 F.3d 617, 622 (7th Cir. 1993) (age discrimination under the ADEA). To assess joint employment, courts in the Seventh Circuit "must employ an 'economic realities' test which is, in its essence, an application of general principles of agency law to the facts of the case." *Frey*,

18

903 F.3d at 676 (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991) (other citation omitted)).  Courts applying the economic realities test must consider the following, non-exhaustive factors:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Frey*, 903 F.3d at 676 (quoting *Knight*, 950 F.2d at 378–79); *see also McCurry*, 942 F.3d at 790; *Harris,* 890 F.3d at 683–85; *Hayden*, 9 F.3d at 622.

"[T]he *Knight* test is merely a more structured analysis of whether the putative employer exercised sufficient control, and whether the 'economic realities' are such that the putative employer can be held liable under Title VII" and in other contexts where it is used.  *Love*, 779 F.3d 702.  The first factor "is the most important," and a court must give it the most weight.  *Id.* (citing *Knight*, 952 F.2d at 378–79); *see also Harris*, 890 F.3d at 684.

### B.  Analysis

As the plaintiff, Gross bears the burden of establishing an employer-employee relationship between him and Peoples Gas.  *See Logan v. City of Chicago*, 4 F.4th 529, 537 (7th Cir. 2021) (citation omitted); *Love*, 779 F.3d at 701 (citing *Knight*, 950 F.2d at 380); *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996).  Gross lists the five *Knight* factors and the elements of the economic realities test in his response memorandum, but he discusses only the first factor, which is again the most important.  *See* Resp. at 6.

To carry his burden of proof, Gross makes the following factual assertions in his response memorandum concerning the amount of control Peoples Gas exercised over him: (1) although Wagner, a WBS employee, "drafted and signed off on" Gross's annual performance reviews, the

19

reviews contained feedback from Peoples Gas employees who managed him; (2) at his deposition, Gross identified several Peoples Gas employees who supervised him; (3) Peoples Gas managers gave him more daily assignments than did Wagner; (4) Gross met with Wagner only once a month; (5) Wagner worked in a different building than Gross; and (6) Gross worked alongside more Peoples Gas employees than WBS employees. *See id*. at 6–7. All of these facts are supported exclusively by direct citations to Gross's deposition transcript, which citations the court must disregard: no case law is cited, and Gross does not cite to the LR 56.1 fact statements or responses. *See id*. As the leading case on LR 56.1 practice in this district states, "providing additional facts in one's responsive memorandum is insufficient to put those facts before the Court." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995)). Nor do factual assertions comparable to those made in Gross's response memorandum (pp. 6–7) appear in the parties' LR 56.1 fact statements. *See* ECF Nos. 143, 149.

In addition, Gross does not identify any specific statements in his performance reviews based on input from Peoples Gas employees, nor are specific statements clear on the face of the reviews in the record. *See* Tucker Aff. Ex. 14, *cited in* RSOF ¶ 43; Pl.'s Tab B, ECF No. 143-3, *cited in* RSAF ¶¶ 3, 22. Wagner's notes on the performance reviews reference Gross's integration with "the team" and managers at his workplace, but nothing has been cited indicating whether the personnel involved were Peoples Gas or WBS employees. *See, e.g.*, Tucker Aff. Ex. 14 at WBS22, WBS29, WBS42. If support exists in the record for finding that material statements were made by Peoples Gas employees, this court is not required to "scour the record" to locate that support. *Hildreth v. Butler*, 960 F.3d 420, 429–30 (7th Cir. 2020), *cert. denied*,

209 L. Ed. 2d 260 (Mar. 8, 2021) (quoting *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008)).

Accordingly, Gross has identified no competent summary judgment evidence establishing the factual foundation he purports to lay for holding Peoples Gas liable as his joint employer. Since Gross bears the burden to demonstrate the existence of an employment relationship with Peoples Gas, summary judgment is appropriate.

### IV. Discrimination and Retaliation Claims

The Seventh Circuit has instructed district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards" in employment discrimination cases. *Ortiz v. Werner Enters., Inc*., 834 F.3d 760, 765 (7th Cir. 2016). Instead, "all evidence" of intentional discrimination "belongs in a single pile and must be evaluated as a whole." *Id*. at 766. The three-step burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), remains available to litigants seeking to prove intentional discrimination claims at summary judgment. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021); *Ortiz*, 834 F.3d at 766; *see also Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022) (collecting cases applying these principles to ADA and ADEA claims). Gross has elected to use the *McDonnell Douglas* framework for some of his claims, *see* Resp. 7–8, 12–13, so the court will analyze his evidence as he requests, keeping in mind that the evidence must be viewed holistically. *See Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (citing *Hall v. City of Chicago*, 713 F.3d 325, 334 (7th Cir. 2013) (other citation omitted)).

The *McDonnell Douglas* framework "is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

21

> The familiar *McDonnell Douglas* approach requires a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext.

*Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601 (7th Cir. 2020)). The elements of the plaintiff's prima facie case under the *McDonnell Douglas* framework "vary depending on the factual context of the plaintiff's claim." *Kidd v. Ill. State Police*, 167 F.3d 1084, 1093 n.13 (7th Cir. 1999) (citing *McDonnell Douglas*, 411 U.S. at 802 n.13, and *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793–95 (7th Cir. 1997)).

The parties sort the facts and claims into four categories: (i) disparate treatment claims based on Gross's race and age; (ii) Gross's ADA claims of disability discrimination and alleged failures to provide him with reasonable accommodations during his employment; (iii) race, age, and disability discrimination claims premised on Gross's non-selection for several internal jobs ("failure to promote" claims); and (iv) claims of retaliation. Mem. Supp. Mot. Summ. J. 12, 16, 19, 20; Resp. 8, 12, 16, 22. Because Gross asks the court to apply a set of prima facie elements specific to his hostile work environment claims, they will be analyzed separately. *See* Resp. 8.

### A. Disparate Treatment: Gross's Termination

With the exception of the ADA claims discussed below, Gross and defendants apply the *McDonnell Douglas* framework to his claims based on his termination. Stated broadly, a prima facie case of discrimination has four elements: (1) the plaintiff falls into one or more statutorily protected categories; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered one or more legally cognizable adverse employment actions; and (4) one or more similarly situated individuals outside his protected class received better treatment. *See Brooks*, 39 F.4th at 434 (citations omitted) (ADA and ADEA); *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020) (Title VII). The first two elements are not contested: "For purposes

22

of summary judgment, WBS does not dispute that Gross is a member of protected classes (black and over forty years of age) or that he met WBS' performance expectations." Mem. Supp. Mot. Summ. J. 13; *accord* RSAF ¶ 10.

For purposes of an intentional discrimination claim, a materially adverse employment action means one that "visits upon a plaintiff 'a significant change in employment status.'" *Boss,* 816 F.3d at 917 (quoting *Andrews v. CBOCS W., Inc*., 743 F.3d 230, 235 (7th Cir. 2014)). "Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Id.* (citing *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007)). Gross's termination in 2017, RSAF ¶ 40, constitutes a paradigmatic adverse employment action. *See, e g*., *Marshall*, 973 F.3d at 793. Except as they pertain to his hostile work environment claims, Gross does not argue that several other actions reflected in the summary judgment evidence properly before the court rise to the level of a materially adverse employment action. For example, Gross received an "achieves expectation" rating on his 2015 year-end performance review; he had received "fully successful" ratings in each of the past three years. RSOF ¶ 43; RSAF ¶¶ 3, 22; Pl.'s Tab B at 1. Gross identifies no consequences (economic or otherwise), such as a change in salary or advancement opportunities, flowing from his 2015 performance review rating. *See* RSAF ¶ 22; Resp. 8–11. Thus, Gross has not shown that his 2015 performance review rating constituted an adverse employment action for purposes of his intentional discrimination claims. *See McCurry*, 942 F.3d at 789 (citing *Lloyd v. Swifty Transp*., *Inc.*, 552 F.3d 594, 602 (7th Cir. 2009)); *see also* Part III.E, *infra* (applying the test for adverse employment actions applicable to retaliation claims); *Krause v. City of LaCrosse,* 246 F.3d 995, 999 (7th Cir. 2001).

Gross's prima facie case based on his termination fails on the fourth element: Gross does not identify a similarly situated comparator whom WBS did not terminate. Gross provides evidence of Wagner's alleged better treatment of Clopton in 2015, such as Wagner's assigning Gross to do work Gross believed Clopton could do. *See* RSAF ¶¶ 5–9. Gross also identifies Dorst as a comparator but cites no specific incidents of Wagner's treatment of Dorst. *See id.* But Gross cites nothing showing whether Clopton or Dorst were, or were not, terminated, which is minimally necessary to make them proper comparators for a discriminatory discharge claim. *See id.*; *see also, e.g.*, *Marshall*, 973 F.3d at 792; *Igasaki,* 988 F.3d at 958–59. "Although they need not be identically positioned, 'similarly situated employees must be directly comparable to the plaintiff in all material respects.'" *Igasaki*, 988 F.3d at 958 (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). Gross cites no evidence showing that Clopton or Dorst had a materially comparable history so as to make either an appropriate comparator considering the specific reasons WBS gave for terminating him. *Compare* RSAF ¶ 40 and Termination Letter at 1; *with* RSAF ¶¶ 5–9. Thus, Gross has not carried his burden to show that a similarly situated employee outside the protected categories to which he belongs received more favorable treatment, so his disparate treatment claims based on his termination are dismissed.

## B. Hostile Work Environment

The Supreme Court has held that "discrimination in the workplace can emanate not only from the terms and conditions of employment, but also when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Brooks*, 39 F.4th at 441 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). The Seventh Circuit has applied the hostile work environment theory to ADA claims, *id.*

24

(citing *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 852 (7th Cir. 2019)), and has assumed, without deciding, that a hostile work environment claim can be maintained under the ADEA, *id.* (citations omitted). A plaintiff proceeding under the *McDonnell Douglas* framework must make a prima facie hostile work environment case by showing:

> (1) she was subject to unwelcome harassment; (2) the harassment was based on disability or age or another protected category; (3) the harassment was sufficiently severe or pervasive, both subjectively and objectively, so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability.

*Id.* (citing *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714–15 (7th Cir. 2021) (other citations omitted)). Defendants did not use this formulation of the prima facie test in their opening summary judgment memorandum; Gross introduced it in his response. *See* Mem. Supp. Mot. Summ. J. 12–16; Resp. 7–8. Defendants' opening memorandum puts only the second and third elements at issue. *See* Mem. Supp. Mot. Summ. J. 14 ("Gross cannot present any evidence that he was subject to any unwelcome harassment that was based on his race, age, or a disability.").

Gross relies almost entirely on direct citations to his third amended complaint and deposition transcript to establish the factual basis for his hostile work environment claim. *See* Resp. 8–12. Since the complaint's allegations are not competent summary judgment evidence and Gross bypassed the LR 56.1 adversary process for presenting facts by citing directly to his deposition transcript, the court does not consider the citations to Gross's third amended complaint and deposition transcript in his response memorandum. *See* Part I.B, *supra*. The court acknowledges that Gross's LR 56.1(b)(3) statement of additional facts describes additional incidents of the type many plaintiffs would ordinarily use to support a hostile work environment claim. Examples include a comment Wagner allegedly made that older people have difficulty with computers, Gross's being assigned to make coffee, and Wagner assigning Gross to conduct

a training course that Gross believed Clopton was capable of conducting. *See* SAF ¶¶ 6–9, 21.

However, Gross does not reference these incidents as support for his hostile work environment

claim in his response memorandum and instead points the court, improperly, to his deposition

testimony concerning still other alleged incidents of harassment mentioned nowhere in the

LR 56.1 fact statements. *See* Resp. 8–10, 12. The court declines to delve into incidents Gross

has not properly put before it at summary judgment or to attempt to analyze a hostile work

environment theory Gross has not articulated because "[i]t is not the responsibility of this court

to make arguments for the parties." *United States v. Phillips*, 596 F.3d 414, 418 (7th Cir. 2010)

(quoting *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999)).

Disregarding improper citations, one incident supporting Gross's hostile work

environment claim is properly before the court at summary judgment: "The unwelcome

harassment included Gross required [sic] to complete the work of his peers, whereas his peers

did not have to complete Gross's work." Resp. 9 (citing SAF ¶ 6). Paragraph 6 of Gross's

statement of additional facts relies on the following portion of Gross's deposition testimony:

> Q.     When?
>
> A.     Several instances.
>
> There was one instance in 2015 when I was asked to do a training program for someone who refused to do it after Dani Clopton and Chuck [Wagner] instructed me to do the training class and I told him that it wasn't fair and that she should do it.
>
> Q.     Okay. And then what happened?
>
> A.     And he asked me are you being insubordinate and I said I am not, and I pointed out to him that she had been with us for eight or nine months and fully capable of doing a training class.
>
> Q.     And what happened next?
>
> A.     He said you're doing it, and I did it.

Gross Dep. 122:2–15.

With inferences favorable to Gross, nothing in this testimony suggests that Wagner's actions were based on Gross's race, age, or disability status. *See, e.g.*, *Brooks*, 39 F.4th at 441 (holding that coworkers' "abusive conduct—swearing, refusing to follow her directions, using disrespectful language—were not focused on [the plaintiff's] age or disability and thus could not create a hostile work environment"). As the Supreme Court has emphasized in the Title VII context, the statutes under which Gross sues prohibit mistreatment based on protected characteristics, so that Gross "must show the link between this treatment" and his age, race, or disability. *Jackson v. Cnty. of Racine*, 474 F. 3d 493, 499 (7th Cir. 2007) (citing *Oncale*, 523 U.S. at 80). To the extent Gross cites his deposition testimony (which again is not properly before the court, *see* Resp. 8–10, 12) to show that he believed Wagner was motivated by improper animas, a plaintiff's "speculation as to an employer's state of mind is not sufficient to create an issue of material fact." *Johnson, supra*, 892 F.3d at 899 (citing *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)). Hence, Gross has not identified evidence from which a reasonable jury could find that, to the extent this incident was harassing, Wagner harassed Gross based on Gross's age, race, or disability. *See id*.

Gross also has not carried his burden on the third element of his prima facie case, by showing that harassment he experienced was objectively severe or pervasive enough to alter the terms and conditions of his employment. "One instance of conduct that is sufficiently severe may be enough" to survive summary judgment on a hostile work environment claim. *Jackson*, 474 F.3d at 499 (citing *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999)). *Smith* is often cited as an example. There, the summary judgment record showed that the female plaintiff's male co-worker pinned her against a wall, called her a bitch, threatened to "fuck her up," and hurt her wrist severely enough to require surgery. 189 F.3d at 531, 534. The Seventh Circuit held that

this single incident was severe enough on its own to permit the plaintiff to go to trial on a hostile work environment claim. *See id*. at 534–35; *see also Rosa v. Bd. of Trs. of the Univ. of Ill*., 2020 WL 7319574, at *8 (N.D. Ill. Dec. 11, 2020) (collecting and discussing several district court opinions holding that a single incident was severe enough to survive summary judgment).

Judge Bucklo's opinion in *Walls v. Turano Baking Co.*, 221 F. Supp. 2d 924 (N.D. Ill. 2002), provides a contrasting example. In *Walls,* the plaintiff, an African American man hired as a salesman, alleged that his immediate supervisor, Hurt, harassed him and used a highly offensive racial slur in his presence and the presence of coworkers. *See id*. at 928, 929. The court held, at the complaint stage, that "considering Hurt's non-racial abusive language in conjunction with his use of the racial slur, Walls' claim falls short of those cases in which isolated instances of harassment created a hostile environment." *Id*. at 930 (citations omitted); *see also id.* at 930–31 (holding that allegations concerning coworkers' conduct were insufficient, considered cumulatively, to support hostile work environment theory); *Diab v. Chi. Bd. of Educ.*, 850 F. Supp. 2d 899, 916 (N.D. Ill. 2012) (dismissing hostile work environment claim at summary judgment); *Scholl v. Educ. Mgmt. Corp.*, 2012 WL 3915662, at *9 (N.D. Ind. Sept. 7, 2012) (same).

Taken in the light most favorable to Gross, the single incident of alleged harassment properly before this court is more like the facts of *Walls* than those of *Smith*. *See* RSAF ¶ 6. Wagner did not physically menace Gross or make physical contact with him. *See id*. Nor did Wagner use overtly racist, ageist, or ableist slurs or physically threaten Gross. *Id*. Accordingly, Gross's hostile work environment claim fails for lack of competent summary judgment evidence that he was subjected to objectively severe or pervasive harassment.

### C.  *Disability Discrimination and Failure to Accommodate*

The ADA prohibits covered employers (referred to as "covered entities") from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." § 12112(b)(5)(A).  Accordingly, the ADA creates "two distinct categories of disability discrimination claims: failure to accommodate and disparate treatment."  *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001) (citing *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021–22 (7th Cir. 1997)).  Gross raises both types of claims.

To prove a violation of § 12112(a), Gross must establish: (1) he was a qualified person with a disability; (2) he was otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; (3) he suffered an adverse employment action, including the denial of a reasonable accommodation; and (4) the adverse action was caused by his disability.  *See Brooks, supra*, 39 F.4th at 433 (citing *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020)); *Basith*, 241 F.3d at 927.

Defendants maintain that Gross has not shown that he had a disability in 2015 or when he was terminated in 2017.  *See* Mem. Supp. Mot. Summ. J. 16–17.  They further argue that the record shows that they provided Gross with reasonable accommodations throughout most of 2015, when he was not on medical leave and returned to work with restrictions.  *Id*. at 18–19.

29

These two issues bleed together somewhat because Gross responds that defendants' failure to accommodate him in 2015 made his ankle condition worse.[9]  *See* Resp. 15–16.

The parties' arguments can be resolved under the ADA's definition of a qualified individual with a disability:

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

42 U.S.C. § 12111(8).

"Applying this definition typically entails a two-step inquiry."  *Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021).  At the first step, the court "asks whether the plaintiff has the basic qualifications required for the position, such as educational prerequisites, employment experience, skills, or licenses."  *Id.* (quoting *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241–42 (7th Cir. 2018)).  Gross's basic qualifications–education, experience, etc.–for the safety consultant job are not in dispute, particularly given that he performed his job and received strong performance ratings for three years.  *See* RSOF ¶ 43; RSAF ¶¶ 1, 3.  At the second step, the court inquires "whether the plaintiff can perform the essential functions of the job with or without reasonable accommodations," considering "the employer's judgment, the employee's written job

---

9  Gross points to three additional putative adverse employment actions.  *See* Resp. 16–17.  First, he argues that his failure to promote claims are based on the ADA, *id.*, but he provides no evidence of the disability status of any of the persons selected for the positions for which he applied.  *See* RSAF ¶ 19.  Only the race of the listed selectees has been provided.  *See id.*  Second, Gross contends that the hostile work environment he experienced was due to his disability.  Resp. 16–17.  Part IV.B, *supra*, explains why summary judgment is proper on Gross's hostile work environment claims.  Finally, Gross asserts that he suffered a materially adverse employment action when Wagner mentioned his hospitalization at a meeting.  Resp. 15 (citing SAF ¶ 28).  Gross cites no legal authority supporting his contention that this comment rose to the level of a materially adverse action and does not develop this one-sentence argument further.  *See id.*  Gross has therefore waived this argument under the well-settled rule that "perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived."  *Greenbank v. Great Am. Assurance Co.*, ––– F.4th –––, 2022 WL 3754722, at *7 (7th Cir. Aug. 30, 2022) (citing *Gross v. Town of Cicero*, 619 F.3d 697, 705 (7th Cir. 2010)).

description, the amount of time the employee spends performing that function, the consequences of not requiring the employee to perform the function, and the experiences of past and current workers." *Conners*, 984 F.3d at 1261 (quoting *Rodrigo*, 879 F.3d at 242).

The parties have provided very little evidence on most of these factors; they rely on the written job description for Gross's job and a smattering of testimony. According to the job description, requirements included sitting, reaching, standing, walking, lifting, pushing, and climbing stairs. Defs.' Tab 4 Ex. 3 at 2–3; *see also* RSOF ¶ 26 (contents of job description undisputed). The written job description reflects defendants' understanding of the job's essential functions, and the court "presume[s] that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Conners*, 984 F.3d at 1261–62 (quoting *Gratzl v. Off. of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Cirs.*, 601 F.3d 674, 679 (7th Cir. 2010)) (applying this presumption to a written job description). Gross offers no contrary evidence. If anything, he amplifies the job's physical requirements. Gross testified at his deposition that his job involved more hands-on work in the field than planning or strategic work. RSOF ¶ 29 (citing Gross Dep. 25–26) (disputed fact resolved in favor of Gross).

*1. 2017 Termination*

There is no genuine dispute that Gross could not perform the essential functions of his job discussed in the prior paragraph when he was terminated in 2017. In February 2017, WBS approved Gross's request for a leave of absence. RSOF ¶ 53. WBS asked Gross for an update in October 2017. RSOF ¶ 53. Gross submitted an updated RTW form and a letter from his physician, which stated that he was totally incapacitated and could not walk, stand, or climb. *See* RSOF ¶ 54; RSAF ¶ 38; Tucker Aff. Ex. 19 at 1–2. As the Seventh Circuit stated in *McAllister v. Innovation Ventures, LLC*, "Once an employee is evaluated by a doctor, an 'employer is entitled

31

to rely on a physician's recommendation that the employee is not able to safely perform an essential function of his job.' " 983 F.3d 963, 968 (7th Cir. 2020) (quoting *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 294 (7th Cir. 2015)). Gross cites no contrary evidence and offers no proposed reasonable accommodation that would have allowed him to perform the essential functions of his job. Thus, he has failed to rebut what his doctor undisputedly told his employer just before he was terminated: Gross could not perform the essential functions of his job at the time (RSAF ¶ 39). *See McAllister,* 983 F.3d at 968–69; *Vargas v. DeJoy*, 980 F.3d 1184, 1189–90 (7th Cir. 2020); *Davidson v. State Collection Serv., Inc.*, 824 F. App'x 424, 427 (7th Cir. 2020).

The notation on the RTW form that Gross was scheduled to be re-evaluated on November 8, 2017, Tucker Aff. Ex. 19 at 2, does not show that Gross was able to perform the job's essential functions or that he would be able to do so at any specific time in the future. Since Gross had been on medical leave for eight months, the notation at most showed Gross's medical incapacity to be indefinite. *See id.* Gross cites no evidence that his condition has improved. The summary judgment evidence establishes that Gross's long-term disability appeal was subsequently granted in May 2018. *See* RSAF ¶ 40. By the time Gross was terminated, he had exhausted his Family and Medical Leave Act time. *See* RSAF ¶ 39; RSOF ¶ 54; Termination Letter at 1. As the Seventh Circuit reaffirmed in a case in which the plaintiff sought a long-term medical leave of absence as a reasonable accommodation, "an extended leave of absence does not give a disabled individual the means to work; it excuses his not working." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017). Quoting its holding in *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003), the Seventh Circuit ruled that "an inability to do the job's essential tasks means that one is not 'qualified'; it does not mean that the employer must excuse the inability." *Severson*, 872 F.3d at 481 (alteration omitted) (also citing

32

*Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999)); *but see Severson*, 872 F.3d at 481 (noting that *Byrne* left open the possibility of short medical leaves to accommodate intermittent medical conditions (citations omitted)). In language applicable to the case at hand, the *Severson* court stated, "Long-term medical leave is the domain of the FMLA." 872 F.3d at 481 (citation omitted). Under *Severson* and *Byrne*, Gross's undisputed inability to work at the time of his termination meant that he did not meet the ADA's definition of a qualified person with a disability, so his ADA claim based on his termination is dismissed.

### 2. *Failure to Accommodate in 2015 and 2016*

Gross submitted several RTW forms beginning in December 2014 in which his doctor placed restrictions on his abilities to perform physical tasks. *See* RSAF ¶¶ 28, 30; RSOF ¶¶ 33–35, 37, 38. Gross's doctor advised that he should not do any squatting or climbing and restricted his standing/walking time to four or fewer hours. *See* RSOF ¶¶ 34, 35, 37, 38; Tucker Aff. Exs. 10–13 (copies of RTW forms). The accommodations defendants provided Gross are not disputed: (1) permitting Gross to wear specially fitting safety shoes, *see* RSOF ¶ 39; (2) moving Gross's office to the first floor, so he would not have to climb stairs, *id.*; and (3) telling Gross that he did not have to walk up any stairs or do anything else prohibited by the RTW forms, *see id.* Gross testified at his deposition that "no one explicitly asked" him to climb ladders or stairs or do anything else not permitted by his restrictions. *See* Gross Dep. 84; RSOF ¶ 40.

Gross also testified, and argues before this court, that he did not receive reasonable accommodations until August 2016. *See* RSAF ¶ 29 (citing Gross Dep. 155:10–18); Resp. 15–16. Gross does not specify what accommodations he believes he needed between December 2014 and August 2016 or why they would have made him able to perform his job's essential

functions.  *See* Resp. 15–16; Gross Dep. 155; RSAF ¶ 29.  Gross's conclusory statements that he

was not being accommodated do not carry his burden at summary judgment, for he must "present

'non-speculative, non-conclusory evidence that a proposed accommodation or treatment would

have allowed him to adequately perform the essential functions of his job.' " [10]  *McAllister*,

983 F.3d at 969 (quoting *Stern*, 788 F.3d at 289); *see also Weigel v. Target Stores*, 122 F.3d 461,

468–69 (7th Cir. 1997) (holding that affidavit's "naked conclusion unsupported by any factual

foundation" did not create an issue for trial).

Elsewhere in his response memorandum, Gross suggests that the accommodations he

received were inadequate because defendants continued to assign him to conduct field trainings,

which "required Gross to climb sets of stairs and . . . lasted for many hours."  Resp. 14 (citing

directly to deposition testimony).  Putting aside the lack of a proper citation to support this

contention, if Gross means to suggest that he should not have been assigned to conduct field

trainings, he provides no evidence shedding light on whether conducting these trainings was an

essential or non-essential job function.  *See* RSOF ¶ 26 (citing Defs.' Tab 4 Ex. 3).  So, to the

extent this is his argument, Gross provides no evidence that removing field trainings from his

duties would have been a reasonable accommodation rather than a change to an essential

function of his job.  "Employers need not reshuffle staff and resources if doing so would require

reallocating an essential function from the plaintiff to another worker."  *Vargas*, 980 F.3d at 1189

_____

10  Gross also asserts, and defendants dispute, that WBS's policies required it to be more proactive and
not leave it to him to speak up when an assignment exceeded his medical restrictions.  *See* Resp. 14.
Gross cites no cases or statutes supporting this argument, *see id*., and he does not develop it further.
To the extent that Gross argues that defendants did not engage in the interactive process concerning a
reasonable accommodation required by the ADA, "this case falls into the category of cases in which
an employer's alleged failure to adequately engage in the interactive process is immaterial" because
Gross has not shown that he was a qualified individual with a disability.  *McCallister*, 983 F.3d at 973
(quoting *Stern*, 788 F.3d at 293, and citing *Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir.
2013)).

(citing *Peters v. City of Mauston*, 311 F.3d 835, 845–46 (7th Cir. 2002)) (holding that assigning a mail carrier light duty work after he aggravated a foot injury and could no longer carry up to 50 pounds, as the job required, would have altered an essential function of the job).

In sum, Gross has not carried his burden at summary judgment to show that he was a qualified individual with a disability either in 2015–16 or when he was terminated. His ADA claims are dismissed.

### D. Failure to Promote

The parties employ the *McDonnell Douglas* framework for Gross's failure to promote claims. Mem. Supp. Mot. to Dismiss 19; Resp. 17. To make a prima facie case of employment discrimination based on failure to promote, Gross must come forward with evidence from which a jury could find that: "(1) he is a member of a protected class, (2) he was qualified for the position sought, (3) he was rejected for the position, and (4) someone outside the protected class who was 'not better qualified' was hired instead." *Barnes v. Bd. of Trs. of the Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (quoting *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016)). Focusing on Gross's qualifications and those of the candidates selected, defendants argue that Gross has not provided sufficient evidence to withstand summary judgment on the second and fourth elements. *See* Mem. Supp. Mot. Summ. J. 19–20. They assert that the jobs for which Gross applied were outside of his department, were rated at a higher salary grade than the job Gross held, and "required more complex skills." *Id.* at 20. Gross responds by citing his resume, the job descriptions, and undisputed evidence concerning the selected candidates. *See* Resp. 17–21. He argues that he met each position's minimum educational and experience qualifications. *See id.* at 17–18. The court notes first that Gross has not identified all of the selectees and that he has not asserted, or cited evidence of, the age and

disability status of any of the selectees he has identified, *see* RSAF ¶ 19, so his failure to promote claims are limited to race discrimination.

The requirements that a plaintiff show that he was qualified for the position and that the employer selected someone outside his protected class who was similarly or less qualified are distinct. *See, e.g.*, *Outley v. City of Chicago*, 354 F. Supp. 3d 847, 863–64 (N.D. Ill. 2019). On the first requirement, "If the plaintiff was not qualified for any reason, then [he] falls short of establishing a prima facie case and there is no inference of discrimination." *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir. 1998) (citing *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997)).

Separately, a plaintiff must produce sufficient evidence for a jury to find that "someone outside the protected class who was 'not better qualified' was hired instead." *Barnes*, 946 F.3d at 389 (quoting *Riley*, 829 F.3d at 892). In analyzing whether the person selected was similarly or less qualified, the Seventh Circuit has instructed courts to consider "all the relevant factors, which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)).

Gross has provided very little information from which to draw this comparison. He relies entirely on a copy of his resume, the written job descriptions for the positions, and four of the selectees' cover letters and resumes. *See* RSAF ¶ 19 (also citing Gross Dep. 94 for different proposition); RSAF ¶ 1 (citing Resume, Pl.'s Tab A); RSAF ¶ 15 (citing Pl.'s Tab C Ex. 4, ECF

No. 143-4 (job descriptions)); Pl.'s Tab N, ECF No. 143-15 (application materials of Gross and certain selectees). Gross argues, Resp. 17, that none of WBS's written policies prohibit an employee from applying for a job outside his or her department or with a higher salary grade. *See* Tucker Aff. Exs. 1–7. Defendants point to no such policy. And nothing on the face of the job descriptions disqualifies applicants outside the department or applicants presently holding a position with a lower salary grade.

Per his resume, Gross earned a bachelor's degree (school unspecified) in political science and a master's degree in public administration from Roosevelt University, likely in 1975. *See* Pl.'s Tab A at 2; Pl.'s Tab N at WBS498. He completed some coursework at Northwestern University's Graduate School of Business, but he did not receive a diploma. Pl.'s Tab N at WBS499. Before he began working for WBS in 2012, Gross had approximately 20 years of experience in Human Resources, including serving as an HR consultant for approximately 16 years. *See* Pl.'s Tab A at 1–2.

Defendants argue that Gross did not meet the formal education requirement for all positions because public administration was not on the list of permitted degrees, but they leave out important language in some of the job descriptions permitting a degree in a "similar" or "related" field to be substituted for the specific disciplines listed. *See* Reply 14–15, ECF No. 148. Generally, "[w]hat the qualifications for a position are, even if those qualifications change, is a business decision, one courts should not interfere with. We do not tell employers what the requirements for a job must be." *Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 621 (7th Cir. 2001) (citing *Gorence v. Eagle Food Ctrs.*, 242 F.3d 759, 765 (7th Cir. 2001)). Where, as here, some of the job listings require a degree in specific disciplines or an "equivalent" or

"similar" field, courts will not strain to read the formal education requirement beyond its "obvious intent." *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1392 (7th Cir. 1990).

The parties do not explore the question of whether Gross's master's degree in public administration is similar or equivalent to the various fields listed in the job descriptions at issue, such as human resources, business, labor relations, and psychology. The job description for Gross's position, Corporate Safety Consultant, required an associate's degree in "Safety, Industrial Hygiene, Health, Human Resources or [a] related field." Defs.' Tab 4 Ex. 3 at 2. WBS obviously considered Gross's master's in public administration to be in a "related field" when it hired him. Thus, on this limited record, a reasonable jury could find that Gross's master's degree in public administration satisfied the stated requirements for a degree in human resources or a related/similar field. *See Lawhead v. Ceridian Corp.*, 463 F. Supp. 2d 856, 866 (N.D. Ill. 2006).

Based on the job descriptions, cover letters, and resumes the parties cite, *see* RSAF ¶¶ 1, 15, 19, Gross has made out a prima facie case as to the following two positions:

- HR Business/Labor Consultant
  - o The job description required a bachelor's degree in "Human Resources, Business, Labor and Employee Relations, Psychology or similarly named discipline." Pl.'s Tab C Ex. 4 at WBS881. A reasonable jury could conclude that Gross's degree was in a similar field.
  - o The selectee, Brandon Pendleton (non-African American), had a master's degree in labor and industrial relations and over 14 years of HR-related experience. Pl.'s Tab N at WBS493–95. A reasonable jury could conclude that Gross and Pendleton were similarly qualified for the position.

- Employee Relations Consultant
  - o The job description required a bachelor's degree in "Human Resources, Employee Relations, Business, Psychology or related fields." Pl.'s Tab C Ex. 4 at WBS878. A reasonable jury could find that Gross's degree was in a related field.
  - o The selectee, Marilou Counard (non-African American), had a master's degree in counseling psychology and a bachelor's degree in psychology. She had 10 years' experience as an "EAP Therapist/Senior Therapist," eight years' experience as a "Team Lead" and/or "Clinic Administrator," and three years' experience as a corporate recruiter. Pl.'s Tab N at WBS505–08. Considering his 20 years of HR

experience, a jury could conclude that Gross and Counard were similarly qualified for the position.

Gross has not made out a prima facie case as to the remaining positions for the following reasons:

- Manager of Safety Services

  o The selectee, Gyldnis King, is an African American woman, so she is not outside Gross's protected class. RSAF ¶ 19; *see also Riley*, 829 F.3d at 892 (citing *Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016)).

- Director of Corporate Security

  o Gross did not meet the minimum educational requirement of a bachelor's degree in "Computer Science, Information Technology, [or] Engineering." Pl.'s Tab N at WBS886. Gross also did not possess "[s]ecurity related experience/background in network infrastructure, cyber security, physical security or critical infrastructure systems." *Id.*

  o Unlike the prior positions, this job description does not permit substitution of a similar or equivalent degree. Gross does not have the equivalent of a computer science or information technology degree or any similar experience on his resume. He has therefore failed to show he was qualified. *See Holmberg*, 901 F.2d at 1392; *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 2015 WL 1887752, at *5 (N.D. Ill. Apr. 24, 2015), *aff'd*, 846 F.3d 216 (7th Cir. 2017); *Jablonski v. Chas. Levy Circulating Co.*, 919 F. Supp. 298, 300 & n.1 (N.D. Ill. 1996).

- Manager of Workforce Planning

  o Gross does not identify the selectee. *See* RSAF ¶ 19. No comparison is therefore possible. *See Outley*, 354 F. Supp. 3d at 864.

- Business Developer

  o Gross does not identify the selectee. *See* RSAF ¶ 19. No comparison is therefore possible. *See Outley*, 354 F. Supp. 3d at 864.

As to the two positions for which Gross has made out a prima facie case,[11] the burden under the *McDonnell Douglas* framework shifts to defendants to provide "admissible evidence

---

11 Defendants argue for the first time in their reply that Gross failed to exhaust his administrative remedies as to these positions because he did not file his September 2015 charge of discrimination within 300 days of the failures to promote. *See* ECF No. 148 at 20. Defendants cite no evidence, and this court knows of none, showing the dates on which any of the hiring decision were made or when, if ever, Gross learned of them. *See id.* Defendants fail adequately to develop this argument, and they have waived it by waiting to make it in their reply brief, thereby depriving Gross of an opportunity to (continued on next page)

setting forth a legitimate, nondiscriminatory reason" for selecting a candidate other than Gross. *Loyd v. Phillips Bros.*, 25 F.3d 518, 522 (7th Cir. 1994) (citation omitted). As the Supreme Court explained in *Texas Department of Community Affairs v. Burdine*, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant." 450 U.S. 248, 255 (1981). As the Court emphasized in a footnote, "An articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Id.* at 255 n.9.

Defendants have not carried their burden at step two of the *McDonnell Douglas* framework. They assert in their briefing and in their LR 56.1(a)(2) statement of undisputed material facts that the person selected for each of the jobs to which Gross applied was considered to be better qualified. *See* SOF ¶¶ 45–46. As proof, defendants rely on the affidavit of Geeta S. Nagarajan ("Nagarajan"), a Senior Human Resources Consultant. *See id.* However, Nagarajan avers only that Gross was not selected and does not purport to give the reasons for any of the hiring decisions at issue. *See* Nagarajan Aff. ¶ 12. Nor does Nagarajan's affidavit provide a basis for finding that she was involved in those decisions or had personal knowledge of the reasons the decisions were made. *See id.* On the contrary, she avers that she has personal knowledge of job titles and pay grades but no more. *Id.* ¶ 4. This is insufficient to carry defendants' burden to articulate, through admissible evidence, a legitimate, non-discriminatory reason for Gross's non-selection. Thus, the *McDonnell Douglas* burden shifting process ends for

_____

(continued)—————————————————————

      respond. *See, e.g.*, *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) (citing *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017)).

the two positions for which Gross has made a prima facie case, and summary judgment is denied

as to those two positions and granted as to the others.  *See Loyd*, 25 F.3d at 524.

### E.  Retaliation Claim (Count V)

Gross brings a retaliation claim under 42 U.S.C. § 1981 in Count V of his third amended

complaint.  ECF No. 55 ¶¶ 93–101.  "Section 1981 causes of action are limited to discrimination

claims based on race."  *Riley*, 829 F.3d at 892 (citing *McDonald v. Santa Fe Trail Transp. Co.*,

427 U.S. 273, 285–86 (1976), and *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 402–03 (7th Cir.

2007)).  Gross asks the court to analyze the evidence supporting his retaliation claim holistically

under *Ortiz*, Resp. 22.  To prevail on his retaliation claim, Gross must identify sufficient

evidence for a jury to find: "(1) a statutorily protected activity; (2) a materially adverse action

taken by the employer; and (3) a causal connection between the two."  *Abebe v. Health & Hosp.

Corp. of Marion Cnty.*, 35 F.4th 601, 608 (7th Cir. 2022) (quoting *Humphries*, 474 F.3d at 404);

*see also Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 633 (7th Cir. 2022) (citing *Boston v. U.S.

Steel Corp.,* 816 F.3d 455, 464 (7th Cir. 2016)) (same elements for Title VII retaliation);

*Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (quoting *Kotaska v. Fed.

Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020)) (same elements for ADA retaliation except that

plaintiff must show a "but for causal connection");  *Brooks, supra*, 39 F.4th at 433 (quoting

*Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)) (same elements for

ADEA retaliation claims).  For purposes of a § 1981 retaliation claim, adverse action means "one

that 'well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination.' "  *Abebe,* 35 F.4th at 608 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*,

548 U.S. 53, 68 (2006)).

Gross contends that he experienced several retaliatory adverse employment actions in his

response memorandum, but he relies on citations to his complaint and direct citations to his

deposition transcript to support nearly all of them. *See* Resp. 22–23. Setting aside Gross's improper citations to the complaint and to his deposition transcript, Gross identifies two statutorily protected activities with support in the LR 56.1 fact statements: (1) his filing of a charge of discrimination in September 2015; and (2) his complaint to defendants' chief HR officer, William Lasko, in August 2015. *See* RSOF ¶¶ 41–42; RSAF ¶ 22; *see also* Resp. 22. "A complaint of discrimination is a protected activity . . . only if the discrimination is based on a protected characteristic like race." *McHale v. McDonough*, 41 F.4th 866, 872 (7th Cir. 2022) (ellipses in original) (quoting *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021)).

It is undisputed, but not supported by the evidence cited, that Gross's EEOC charge alleged discrimination based on race, age, and disability. *See* RSOF ¶ 42. "Filing a charge with the EEOC *about the alleged discrimination* is the most obvious form of statutorily protected activity." *McHale*, 41 F.4th at 871 (alteration omitted; emphasis in original) (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Further, uncontested summary judgment evidence establishes the specifics of Gross's complaint to Lasko: He complained about the lack of advancement opportunities for minority workers. *See* RSOF ¶ 41 (citing Gross Dep. 133:7–15). As these facts are undisputed at summary judgment, Gross has carried his burden to show that his EEOC charge and his complaint to Lasko were statutorily protected activities. Cf. *McHale*, 41 F.4th at 871–72 (discussing and applying test for determining whether a particular EEOC charge or internal complaint constitutes statutorily protected activity).

Gross argues regarding the third element of his prima facie case, "There is a casual [sic] connection because the adverse actions against Gross were immediate after his complaints."

Resp. 23–24.  Gross cites nothing to support his contention of immediate reprisal, *see id.*, and the undisputed evidence refutes it.  Defendants terminated Gross in October 2017, more than two years after he complained to Lasko and filed his September 2015 EEOC charge.  RSAF ¶ 39.  It is undisputed that Gross applied for five of the six jobs at issue in this case before he engaged in protected activity in August and September 2015.  *See* RSOF ¶ 44 (applications submitted "between April 2013 and April 2015").  And Gross applied for the Manager of Safety position in January 2017, more than a year after he engaged in protected activity.  *See* RSOF ¶ 51 (undisputed).  The parties cite no evidence showing when decisions were made on Gross's job applications.

The Seventh Circuit has "held that summary judgment is inappropriate where as much as a month's delay occurred between the protected activity and adverse employment action, where that suspicious timing was combined with additional evidence of pretext."  *Parker*, 39 F.4th at 937 (citing *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012)).  But "suspicious timing alone is not enough to establish a causal connection between the adverse action and the protected activity."  *Abebe*, 35 F.4th at 608 (citing *Coleman*, 667 F.3d at 860).  Gross's causation argument therefore fails both because he relies on suspicious timing alone and because he cites no evidence showing that the amount of time between his protected activities and the adverse employment actions he experienced falls within the window the Seventh Circuit has found to be suspicious.  Because Gross has not come forward with sufficient evidence of causation, his retaliation claim is dismissed.

### V.  Conclusion

For the reasons stated, defendants' motion for summary judgment is granted in part and denied in part.  Defendant Peoples Gas is dismissed because plaintiff has not shown that a genuine issue for trial exists on whether it was his joint employer.  All of plaintiff's claims are

dismissed on the merits except for plaintiff's failure to promote claims based on his applications

for the positions of HR Business/Labor Consultant and Employee Relations Consultant.


Dated:  September 30, 2022                                    _____/s/_____
                                                                          Joan B. Gottschall
                                                                          United States District Judge